UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COFFEE CAPITAL & DEVELOPMENT, LLC,

Plaintiff,

v.

RPT RESTAURANT ACCOUNTING SERVICES, LLC,

Defendant.
_____________________________ /

Case No. 23-13203

F. Kay Behm
United States District Judge

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 13)**

## I. PROCEDURAL HISTORY

Plaintiff, Coffee Capital & Development, LLC, filed this negligence action in state court and on December 15, 2023, Defendant, RPT Restaurant Accounting Services, LLC removed it to federal court based on diversity jurisdiction. (ECF No. 1). On April 25, 2024, RPT filed a motion for summary judgment claiming that the Wisconsin choice-of-law provision in the parties' agreement barred Coffee Capital's negligence claim. (ECF No. 13). Coffee Capital filed a response and RPT filed a reply. (ECF Nos. 19, 21). The court held a hearing on January 22, 2025. For the reasons set forth below, the court **GRANTS** Defendant's motion for summary judgment.

## II. FACTUAL BACKGROUND

According to the complaint, RPT has a combined 100 plus years of restaurant accounting experience. The complaint also alleges that RPT partners with owners and management to streamline and simplify their financial processes, allowing owners and managers to focus on the customer. Further, RPT assists clients with accounts payable, deposit verification, payroll, monthly financial statements, business planning, budgeting, and much more. (ECF No. 1-1, PageID.11, ¶ 7). RPT is a Wisconsin limited liability company. (ECF No. 1-1, PageID.11, ¶ 2). Coffee Capital is a Michigan drive-through coffee franchise. (ECF No. 1-1, PageID.11, ¶ 6; ECF No. 19-2, ¶ 4). Coffee Capital is a Michigan limited liability company. (ECF No. 1-1, PageID.11, ¶ 1).

On November 1, 2021, RPT and Coffee Capital entered into a Financial Services Agreement. (ECF No. 13-2, Affidavit of Richard S. Schroeder; Exhibit 1-A, Financial Services Agreement (the "Agreement"), p. 1; ECF No. 1-1, PageID.11, ¶ 8). Pursuant to the Governing Law provision in the Agreement between the Parties, "[t]he laws of the State of Wisconsin shall govern this Agreement, without reference to such state's conflicts of laws provisions." (Agreement, Ex. 1-A, ¶ 11.1). Under the Agreement, RPT agreed to provide certain accounting services, as outlined in the Agreement, in exchange for fees and payment.

(Agreement, ¶¶ 1, 3; ECF No. 1-1, PageID.11, ¶¶ 6-8). Such accounting services are outlined on page 8 of the Agreement and include, but are not limited to, handling certain sales transactions, accounts payable, payroll, and cash. (Agreement, p. 8; ECF No. 1-1, PageID.11, ¶ 7). RPT provided these services to Coffee Capital pursuant to their Agreement. RPT had no duty to provide these services to Coffee Capital but for the Agreement. As part of RPT's services provided to Coffee Capital under the Agreement, RPT would occasionally initiate electronic cash transfers of Coffee Capital's money to necessary recipients related to Coffee Capital's business. (Agreement, p. 8; ECF No. 1-1, PageID.11, ¶ 9).

According to RPT, at some point in or around July 2023, a "fraudster" infiltrated Coffee Capital's email system, which led to and caused the losses described in the Complaint. (ECF No. 1-1, PageID.10-14). Defendant denies that a fraudster infiltrated its email system. Instead, Coffee Capital maintains that it was RPT's email system that was infiltrated, which led to the losses suffered by Coffee Capital. (ECF No. 19-2, ¶ 8).

On October 23, 2023, Coffee Capital sent RPT a letter terminating the Agreement, effective November 21, 2023. (ECF No. 13-A, Affidavit of Richard S. Schroeder; Exhibit 1-B, Coffee Capital Termination Letter (the "Termination Letter")). The Termination Letter states the following, in relevant part:

> I am writing to inform you that we are terminating our financial services agreement with RPT accounting pursuant to Section 4.2 effective November 21, 2023. While I am thankful for the services and support that RPT has provided, the recent loss of over $100,000 due to what we and our attorney view as negligence is something that cannot be overlooked and constitutes a material breach of RPT's duties under the agreement.

*Id*.

Shortly after the fraudster gained access to RPT's email system, Coffee Capital sent an email to RPT regarding an anticipated, upcoming electronic cash transfer. (ECF 19-2, at ¶ 9). Based on information and belief, Coffee Capital alleges that the fraudster prevented RPT from receiving the email regarding the anticipated, upcoming electronic cash transfer. (ECF No. 19-2, at ¶ 10). RPT admits that it never received the email regarding the anticipated upcoming electronic cash transfer and that a fraudster interfered with Coffee Capital's email.

Instead, on or about July 13, 2023, RPT received a different email containing electronic payment instructions, the sender purporting to be a principal of Coffee Capital. (ECF No. 19-2, ¶ 11). The sender of that email was actually the fraudster using an email address that misspelled a part of the Coffee Capital principal's email address. (ECF No. 19-2, at ¶ 12). RPT failed to identify the misspelled email address. (ECF No. 19-2, at ¶ 13). RPT failed to recognize

that the email was sent by the fraudster and not by the Coffee Capital principal. (ECF No. 19-2, at ¶ 14). Coffee Capital alleges that RPT failed to confirm directly with Coffee Capital the electronic transfer instructions, but RPT denies this allegation. (ECF No. 19-2, at ¶ 15). RPT ultimately initiated the electronic cash transfer to the fraudster's account. Coffee Capital lost at least $103,490.21, which was the amount of the electronic cash transfer. (ECF No. 19-2, at ¶ 16). RPT contacted Coffee Capital after making the electronic cash transfer of $103,490.21 and inquired about making a second transfer to the fraudster's account, apparently based on a second attempted scam by the same fraudster. (ECF No. 19-2, at ¶ 17).

Coffee Capital alleges that has suffered damages in addition to the loss of the $103,490.21 as a result of RPT's negligence including, by way of example, costs incurred by having to onboard a new accounting firm, costs related to the loss of capital, and costs in connection with having to transfer other funds to the appropriate recipient. (ECF No. 19-2, ¶ 18). Both parties contend that the other was in the best and only position to discovery and prevent the fraud. RPT has refused to reimburse Coffee Capital for the loss. (ECF No. 19-2, ¶ 20).

Coffee Capital filed its Complaint in the Oakland County Circuit Court, State of Michigan on October 20, 2023. (ECF No. 1-1, PageID.10-14). On

December 15, 2023, RPT removed the case to the Eastern District of Michigan and filed its Answer and Affirmative Defenses to Coffee Capital's Complaint. (ECF No. 3, PageID.17-27).

## III. ANALYSIS

### A. Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable

inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477

U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B. Choice-of-Law

Federal courts sitting in diversity must apply the choice-of-law rules of the state where the federal district is located – here, Michigan. *Stone Surgical, LLC v. Stryker Corp*., 858 F.3d 383, 389 (6th Cir. 2017); *see also Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). Michigan's public policy favors the

enforcement of contractual choice-of-law provisions. *Turcheck v. Amerifund Fin., Inc.*, 272 Mich. App. 341, 345 (2006). Determining the applicable law involves "balanc[ing] the expectations of the parties with the interests of the States." *Martino v. Cottman Transmission Sys*., 218 Mich. App. 54, 60 (1996). Even where the choice-of-law provision expressly disregards the chosen state's conflict-of-law rules (as is the case here), the analysis under Michigan law remains unchanged. *See Nat'l Collegiate Student Loan Trust v. Peterson*, 2013 WL 6124279 at *2 (Mich. App. Nov. 21, 2013).

Michigan courts look to §§ 187 and 188 of the Second Restatement of Conflict of Laws to decide whether contractual choice-of-law provisions are enforceable. *Honeycutt v. Thor Motor Coach, Inc*., 2022 WL 17340471, at *2 (E.D. Mich. Nov. 30, 2022) (citing *Chrysler Corp. v. Skyline Indus. Servs*., 448 Mich. 113 (1995)). Section 187(1) permits the application of the parties' choice of law if the contested substantive issue is one they could have resolved by an explicit contractual provision "directed to that issue."

In *Honeycut*, the court explains that there are two exceptions to this general rule. One, where "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Id*. at *2 (quoting Restatement (Second) of Conflict of Laws § 187(2)(a)

(emphasis added). Or two, where applying the chosen state's law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id*. (quoting § 187(2)(b)).

Applying this framework, the court concludes that the choice-of-law provision is enforceable. RPT is a Wisconsin limited liability company with its principal place of business in Wisconsin. "This is, in and of itself, sufficient to establish a 'substantial relationship' under Section 187(2)(a)." *Ace Hardware Corp. v. Oxford Vill. Hardware, Inc*., 2009 WL 236704, at *5 (E.D. Mich. Feb. 2, 2009); *see also JTH Tax, Inc. v. Magnotte*, 2020 WL 127949 at *4 (E.D. Mich. Jan. 10, 2020) (holding that the plaintiff's principal place of business is sufficient to establish a "substantial relationship"). And so long as "the state of the chosen law has some substantial relationship to the parties ..., [they] will be held to have had a reasonable basis for their choice." *Honeycut*, at *3 (quoting Restatement (Second) of Conflict of Laws § 187 cmt. f.). The second exception does not apply because the application of Wisconsin law does not conflict with Michigan public policy, which favors the enforcement of contractual choice-of-law provisions. *Turcheck, supra*.

Coffee Capital maintains that the choice-of-law provision is irrelevant because it is suing on a tort claim, not a contract claim. However, the "Sixth Circuit has held repeatedly that contractual choice of law provisions apply to tort claims that are closely related to the contractual relationship, as opposed to those that are only tangentially related." *CajunLand Pizza, LLC v. Marco's Franchising, LLC*, 513 F. Supp. 3d 801, 805 (N.D. Ohio 2021) (citing *Adelman's Truck Parts Corp. v. Jones Transp.*, 797 F. App'x 997, 1000 (6th Cir. 2020) (applying contractual choice of law to claim under North Carolina Unfair and Deceptive Trade Practices Act because the tort claim was sufficiently related to the contract); *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993) (applying contractual choice of law to fraud and misrepresentation claims because they were sufficiently related to the contract); *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1139-40 (6th Cir. 1991) (concluding that contractual choice-of-law provision applied to tort claims of fraud and misrepresentation); *Baumgardner v. Bimbo Food Bakeries Distribution, Inc.*, 697 F. Supp. 2d 801 (N.D. Ohio 2010) (Lioi, J.) (applying contractual choice of law provision because allegations that bakery tortiously interfered with distributers sale of his distribution route and was unjustly enriched by interference were closely related to distribution agreement.)).

Importantly, each of these cases examines the language of the choice-of-law provision to determine if it encompasses tort claims. *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993) (holding that a choice-of-law provision[1] was sufficiently broad to cover the plaintiff's claims for fraud and misrepresentation that were "directly related to" the contract). Here, the provision reads as follows: "Governing Law: The laws of the State of Wisconsin shall govern this Agreement, without reference to such state's conflicts of laws provisions." (Agreement, Ex. 1-A, ¶ 11.1). In *Adelman's Truck Parts Corp. v. Jones Transport*, 797 F. App'x 997 (6th Cir. 2020), the choice of law provision read as follows: "This Purchase Order shall be governed by and construed in accordance with the laws of the State of Ohio." *Id*. at 1000. The court concluded that there was no difference between this provision and that in *Moses v. Business Card Exp., Inc.*, 929 F.2d 1131 (6th Cir. 1991), which read: "This Franchise and License Agreement and the construction thereof shall be governed by the laws of the state of Michigan." *Id*. at 1139. In *Moses*, the court concluded that fraud and misrepresentations were covered by the language. The court held that, like in

[1] The choice of law provision in *Banek* reads as follows: This Agreement was made and entered into in the State [of] Georgia and all rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Georgia." *Id.* at 359.

*Moses*, the choice-of-law clause referred to more than the construction of the contract. As explained in *Moses*, if the clause only provided that its construction would be governed by the law of Michigan, the plaintiffs would have support for their argument that it does not apply more generally. *Id.* at 1139-40. The court contrasted the language with that in *Caton v. Leach Corp*., 896 F.2d 939 (5th Cir. 1990), where the choice of law clause provided that "[t]his agreement shall be construed under the laws of the State of California." The *Caton* court held that "[t]he parties' narrow choice of law clause does not address the entirety of the parties' relationship," and thus did not apply to the plaintiff's tort claims. *Id*. at 943. The *Caton* court contrasted the narrow clause in that case with an example of broader language, "govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of this contract." This language would cover more than pure contract claims. *Id*. at n. 3.

The language here is more like *Caton* than *Moses*, *Adelman*, or *Banek*. Each of these Sixth Circuit cases addressed more broadly worded choice-of-law provisions and each included something more than the agreement merely being governed by the law of a particular forum, which is what is presented here. Accordingly, the negligence claim is not necessarily governed by the choice of law provision.

Instead, "[u]nder Michigan law, tort claims are determined according to the law of the forum, unless there is a 'rational reason' to displace the forum's law." *Allmand Assoc., Inc. v. Hercules Inc.*, 960 F. Supp. 1216, 1222 n. 3 (E.D. Mich. 1997) (quoting *Olmstead v. Anderson*, 428 Mich. 1, 29-30 (1987)). In *AGA Gas, Inc. v. Wohlert Corp.*, No. 5:98-CV-155, 2000 WL 1478466, at *2 (W.D. Mich. July 21, 2000), the court noted that a choice of law provision may provide a reason to displace Michigan law on Wohlert's contract claim. *Id*. (citing *Imaging Financial Services, Inc. v. Lettergraphics/Detroit, Inc.*, No. 97-1930, 1999 WL 115473, at *3 (6th Cir. Feb. 9, 1999) (choice of law provision in parties' contract "may be a reason to displace Michigan law on the contract claims"). However, the court held that no reason existed to displace Michigan law on the plaintiff's claims of fraud and misrepresentation, because the plaintiff's alleged injury occurred in Michigan to a Michigan company. *Id*. Similarly here, the injury occurred in Michigan to a Michigan company. Therefore, like *Wohlert*, Michigan law, rather than Wisconsin law, applies to the negligence claim.

C. Negligence Claim[2]

[2] The parties agree that Michigan law and Wisconsin law are essentially the same as to when a party may pursue a tort claim where a contract also governs their relationship. Accordingly, even if the court were to apply Wisconsin law, the result would be the same.

The application of Michigan law to Coffee Capital's negligence claim does not, however, save it from dismissal. Under Michigan law, a defendant acting pursuant to a contract is liable in tort only if he or she "owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations." *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 497 (6th Cir. 2014) (quoting *Fultz v. Union–Commerce Assocs.*, 470 Mich. 460 (2004); *see also Hill v. Sears, Roebuck and Co.*, 492 Mich. 651 (2012); *Hart v. Ludwig*, 347 Mich. 559 (1956) (tort action can be brought when "a situation of peril has been created, with respect to which a tort action would lie without having recourse to the contract itself"). When the parties have contracted directly, such a duty may arise if one party's conduct "creates a new hazard" resulting from something more than non-performance. *Id.* (citing *Fultz*, 683 N.W.2d at 592–93). Some older cases draw a distinction between nonfeasance and misfeasance, finding only the latter to be actionable in tort, but this approach has largely been supplanted by the "separate and distinct" and "new hazard" standards. *Id.*; *see Fultz*, 683 N.W.2d at 592 ("[T]he former misfeasance/nonfeasance inquiry ... is defective because it improperly focuses on whether a duty was breached instead of whether a duty exists at all.").

In *Ram*, the plaintiff alleged that ADT was negligent because it installed a poorly designed alarm system, failed to install a line security feature, and failed to protect the store or alert police on the night of the burglary. *Id*. at 496. However, the court found that ADT did not owe Ram a statutory or common-law duty to detect the burglary or dispatch the police. *Id.* at 497. The court also rejected Ram's theory that ADT had a duty to perform its contractual obligations with due care. Ram pointed to cases involving third party plaintiffs who were injured while the defendant was carrying out contractual duties to a different party altogether. These cases, however, establish only that "a contracting party's assumption of contractual obligations does not extinguish or limit separately existing common-law or statutory tort duties *owed to noncontracting third parties*." *Id*. at 498 (quoting *Loweke*, 809 N.W.2d at 554 (emphasis added in *Ram*)). Although *Loweke* acknowledges a common law duty to perform one's undertakings with due care, it also states that "no tort liability would arise" where a defendant "fail[ed]to fulfill a promise in the absence of a duty to act that is separate and distinct from the promise made." *Id*. (quoting *Loweke*, at 558 (quotation omitted)). Thus, the cases *Ram* cited did not grant it a cause of action in tort based on a common law duty of care when it contracted directly with the alleged tortfeasor.

Coffee Capital claims that the accountant-client relationship gives rise to "certain legal duties" and likens the relationship between accountant and client to that between common carrier/passenger, innkeeper/guest, and doctor/patient. (ECF No. 19, p. 11). However, Coffee Capital cites no cases suggesting any common law duty arising from the accountant-client relationship. In fact, case law holds that there is no common-law fiduciary relationship between accountants and clients. The accountant-client relationship is not a traditionally recognized fiduciary relationship. As explained in *Banker & Brisebois Co. v. Maddox*, No. 310993, 2014 WL 1720285, at *6 (Mich. Ct. App. Apr. 29, 2014), there is no Michigan caselaw holding that an accountant generally owes a fiduciary duty to his or her clients. Instead, Michigan only finds a fiduciary relationship when special facts support such a heightened duty. *Id*. (citing *Shwayder Chem Metallurgy Corp v. Baum*, 45 Mich. App. 220 (1973) (finding a fiduciary relationship where the accountant began as a private consultant but was then hired as the plaintiff company's business manager). Coffee Capital does not allege the existence of a fiduciary duty in the complaint nor does it attempt to make the case in its response brief. Coffee Capital has not identified any common law duty imposed on RPT under Michigan law that is separate and distinct from the contract. The court declines to create a duty in the absence of clear authority

from the Michigan courts. Accordingly, Coffee Capital's negligence claim must fail.

## IV. CONCLUSION

For the reasons set forth above, the court **GRANTS** Defendant's motion for summary judgment on Plaintiff's negligence claim.

**SO ORDERED**.

Date: January 23, 2025

s/F. Kay Behm
F. Kay Behm
United States District Judge